Good morning. May it please the Court, my name is Rupert Eniguez, and I'm counsel for the appellant, Mr. Ariel Terry-Crespo. Three years ago, the United States Supreme Court unanimously held that an unreliable tip standing alone does not give an officer reasonable suspicion to effectuate a Terry stop. That is, Your Honors, exactly what we have here. The record shows it. We have an unreliable tip, but that's the only information the officer had. And nonetheless, they stopped him because they believed he had a gun. Because of that, the motion suppressed should be reversed. The record, I say, indicates that the case where the Supreme Court made that holding is factually distinguishable from this case, isn't it? Your Honor, I would say that the facts here are even stronger than they were there. What we have here is an officer who admitted on his testimony that the question was asked, Other than that report, did you have any reason to suspect Mr. Terry-Crespo of illegal conduct that night? Answer, no. I'm reading from the excerpt from page 47. Your suspicion, your belief that he was engaged in illegal conduct was based entirely on that report, on the report I was given by dispatch. That's correct. I want you to compare the report, however, in this case with the one the Supreme Court had before. The report here, Your Honor, the evidence in the record shows that it was much more unreliable than that report in JL. Here, the only possible distinction, the distinction that the government's tried to rest its hat on all along is the fact that this gentleman gave a name. Initially, he said his name was Jose. When he was pressed, he gave a last name that he purposely, intentionally misspelled. What's the evidence that he purposely and intentionally misspelled? I would suggest, Your Honor, that the record here shows that this gentleman who called was unreliable for several reasons and purposely did not want to be held accountable. The dispatch operator, when she conveyed the information to the officers, indicated herself that the complainant does not want to have contact. ER at 15, complainant drove off, didn't want contact. And several points throughout the record, Excerpt at 5, 11, 7, and 15, the complainant, when he's calling in, he says, I don't want, I don't want, I don't want. Now I want to go. He does not express fear rather than lying? No, Your Honor. It's indicating that he does not want to be held accountable for the statements that he's given here. He doesn't want to give a cell phone number. He doesn't want to give his location. He, in fact, and the government concedes it, lies about his location. Well, it was pretty evident, Counsel, wasn't it, from the second call where he was. He had to be close by because he identified on the phone that he could see the officer and describe circumstances that indicated that he, in fact, was nearby. And yet, Your Honor, he's indicating that he's not nearby. He tells, he tells in that exact exchange with the dispatch operator what he's indicating. And it would seem that he's there because he says he's in the parking lot. He's walking there. The police, she asks him, where are you right now? 12th and Division. The record shows that 12th and Division is 1.2 miles away from there. So he's either lying about his location, which I would say is what the government would like you, have you believe, or if he's telling the truth that, what he also says is that my friend, he drove me away from there the first time. He drove me away and he suggests that my friend, my friend says he's there. My friend is around there in the car. The guy gave me a ride away from there. And in fact, the dispatch operator, when she reports the second call, tells him that this is, she uses the word, the second information from somebody else. So she's believing what he's saying, that he's not there, that this is hearsay information from another person. So either way, this gentleman, whichever way we dice it, he's lying. And there's other information in the record also that suggests he doesn't want to be held accountable, which is the lynchpin under Florida J.L. The person not only has to be reliable, but he has to give predictive information. That predictive information has to be corroborated. And we have neither one of those things here. He wasn't able to predict anything. He told the operator, he admitted he didn't know where the man with the gun had gone. In Florida J.L., they knew he's at a bus stop. There's a black man with a plaid shirt, he has a gun, he's at the bus stop. They go there, they see that. This man didn't know where he'd gone. Morales, the officer, the complainant there, the tipster, had said, there's a vehicle with Hispanics, certain license plate going from Spokane to Missoula. There, this court held that wasn't sufficient because the officers didn't corroborate the information. Just as here, the description of the person that the complainant wanted to identify was enough. It's not enough to simply accuse, in the Supreme Court's words, that the tip must be reliable in its assertion of illegality, not just in its tendency to identify a determined person. So here, all the officer knew is, here's the person, because the description seems to match, here's the person that this person wants to accuse. But the officer admitted throughout, he relied on nothing other than that report. At ER 57, he says, did you, question, did you see anything that independently corroborated the accusations that he had a gun? Answer, no. Counsel, what happens if a person is stopped on the street, somebody pulls a gun in an attempted robbery, it fails, and somebody, and this person goes and runs, finds an officer and says, this is the guy right here, you know, I'm going to describe the man who's standing in front of me, and the officer can't see a gun, and has no other indication other than the physical description and the person's word for it. What's different? That's a great example, Your Honor. There you have a person, there is a case, and I'm not calling the name of it off the top of my head, the 9th Circuit case, where the officer walks up to the car, and somebody has told him, somebody who's familiar with, we can identify and can hold accountable for the accusation, says, the gentleman in that car has a gun in his lap. The officer walks up, and does a Terry stop on him, and finds a gun. And the court said, that's okay. What if that person refused to identify him or herself? I don't want to get involved. That's the person who did it, but I don't want to get involved. Then would the officer have enough to... Here, Your Honor, had we had, for example, this man refuse to give a cell phone... But would you answer my question, in the example that Judge Bybee gave you, if the witness did not identify him or herself, would the officer still have enough reasonable suspicion for a Terry stop? I would need more facts, Your Honor, under the... Under those facts, would the officer have enough for a Terry stop? I'm assuming the person is there. You've just had direct contact with the person, and so he's there, you can identify him, you see him there, or you can locate him. Under those facts, yes, you have enough. If you can't locate them, if you can't locate the person, they don't give their name, they're just there for that moment to identify him. And he's gone, you don't know who he is, where he went, no. So in your view, that would be an anonymous tipster? You have no information that establishes the reliability, only if you corroborate the predictive information that he's given you. If he gives you predictive information, and the officer then corroborates it with direct observations of his own, then yes. But if all you have is somebody giving you information that then leaves, and you're not able to contact, not hold him accountable, he's not giving you predictive information, and you don't corroborate any of the information that he's giving you, then no. That's what the Supreme Court has told us, and that's all we're asking this Court to do. That places an enormous burden on police who have a complaint here that they've got a man who's pulled a gun on somebody. No doubt. And we've got, we have somebody who's called in on a cell phone, who has given a name, which may or may not be an accurate spelling of the name, it appears that he's misspelled a common Hispanic name, Dominguez, but the police can either sort of run a Google search and see whether they can find some guy named Dominguez, or they can go over and pat the guy down that's been identified as having just pulled a gun on somebody. The burden on the police is no greater than it is in any other situation, and the Supreme that there is a gun is not enough. There is no firearms exception to Terry. And what I would suggest that should happen here is, you have to, if this is the person that you believe they're accusing, then you have to wait. This officer should not have had his lights on, spotlighted him because he stopped there, pulled out the gun and told him, hands up, get on the floor, arm behind your back, prone. What he should have done is wait and observe and corroborate any information that he had. If he had some corroborative information that this person had a gun, if there was anything else, any sort of movement to the backpack, anything that would corroborate his suggestion to this officer that there was a gun, then he would have stopped him. That's all that's required. Counsel, are 9-11 calls recorded here? Yes, Your Honor, they are. And is it against the law to place a false 9-11 call? Your Honor, if there were, yes. Would those two conditions increase the reliability of those calls? No, Your Honor, in fact, the officer testified that he gets false reports, he gets false names. And that's what the Supreme Court has said, is that because a person can give false information, we have to be able to hold him accountable. Well, in jail, one of the factors that the court considered important was that the call was not recorded. Your Honor, here we have a recorded call, but that's all we have. This court, and I believe it was earlier this year in the Thomas case, held that only just because the information was coming from an FBI agent, they didn't know where the information that the FBI was conveying to the police office, to the sheriff's office, was coming from. Here all we have is a dispatcher, not the FBI, a dispatcher who's conveying information for someone who we don't know, unidentified. The government, with its tremendous resources, the only thing they were able to give the court is, out of a country of 280 million inhabitants, one person who had the name in a database misspelled as G-I-S, or Jominguez, and they had it as A-K-A, as G-U-E-Z, which is the correct spelling, one person out of 280 million. The only other information they could give us is a Star Trek character, misspellings. That's the only thing that could, this person is unidentified. The officer testified he doesn't know who the man was, has never had any contact with him. A year ago, two years ago, and as we stand here today, they're not able to locate or identify this person for you. This person is unknown, unidentified, misspelled. That's nice that we would have the hindsight, because somebody could have given, he could have given his name as, could have given some other name, and could have given the name of some friend, and we would have no way of verifying that. In fact, the officer has got to make a very quick decision as to whether he's going to go, whether he's going to go and stop somebody on the street who's just been accused by somebody on the phone, who's currently on the phone with the dispatcher saying, this guy's just pulled a gun on me. Your Honor, the cases are clear, the officer needs something more. An officer cannot simply rely on a tip that provides no predictive information and is not corroborated. That's all the officer has to do, is make sure, because if he doesn't have the name, for example, you're saying a person gives another name, they can, it happens all the time, the officer testifies, he gets false reports of false names. What you need then is not simply the tip, because you don't know anything about the reliability of the informant, and that is the key. You need predictive information and corroboration. We have neither here, the record's clear. Nothing other than the unreliable, unsubstantiated, uncorroborated report of an unidentified individual, who, I would submit, makes it stronger than J.L. even, Your Honor, because here, there's substantial evidence in the record that this person was not only questioning his reliability, he was unreliable. Was J.L. the victim of a crime? J.L., I believe, Your Honor, is the gentleman, the black young man with the plaid shirt who was searched. All right. The person who made the report. It was a non-mistake. In jail. Was he the victim of a crime? That is not, we cannot glean that from jail. In this case, the person who made the report was the victim of a crime. Claimed victim of a crime, Your Honor, and I would suggest also that that's another distinction that you make. This gentleman said, we don't even know if it was a crime yet, but this gentleman said seven times, and I can point you to the record for this, seven times what he reported is he showed, he used the word show, show, showed. The dispatch operator used the word threat. Not this gentleman. The gentleman kept indicating that this person showed him the gun. Somebody showing the gun does not necessarily commit a crime. And if you'd like the cites, I would give you the record. So when he minimized the fact that he was telling the truth? Excuse me, Your Honor. Sorry. I was just teasing you. All right. Thank you, counsel. Thank you. I'm going to please the court, Fred Whitehouse, assistant U.S. attorney, Mr. Gorgan. Counsel's trying to pigeonhole this J.L. case, but it doesn't work because we have a victim of a crime who had a weapon pointed at him. It turned out to be a loaded .45 pistol with a round in the chamber who gave his name. Now he was scared. He probably misspelled it. When he was asked the phone number, he said, well, I don't have it. In J.L. Counsel, did the 9-1-1 dispatcher have a display that would show the phone number of the incoming call? There's no indication in the record of that, Your Honor. What's important about that call taker, there's a call taker and then a dispatcher. That call taker had a lengthy conversation with the victim. It covers five pages of the transcript. And at the end, he says, I'm not going to stay here. And she says, I don't blame you. So she assessed his reliability. There was a named individual with an array of factors, the location, the age, the race, the clothing, the description of the weapon. In J.L., you have an anonymous caller that was not recorded. Simply say there's a kid with a gun wearing a plaid shirt at this bus stop. Counsel, what about opposing counsel's representation that the word used by the purported victim was show the weapon rather than pointed the weapon? What's your response to that? My response is that he said he pointed the gun at him. I think that's in the ER, page four. He got a gun and he pointed. He showed to me, he showed to me. But it does say he pointed. So you have a victim of a crime who's contemporaneously watching this person. What we didn't discuss enough is the fact that there's a second phone call here. That the terms this court has used are indicia of reliability and range of details. In this case, there's a second call that comes in as the officer's at the motel, where the victim says that he's got the spotlight on him now. You look at the times in the CAD printout, the computer assistant dispatch. It's right on the money. The call came in at 11.05. The officer said he pointed his weapon at the defendant. Seven minutes later, that's 11.12. You look at the computer assistant dispatch, the second call came in at about 11.10. And if you look at the transcript, the call, the second transcript, the victim is saying the officer's spotlighting him now, we're at this motel. They then radio the officer and say, okay, there's new information at this motel room. And the officer says room 147, which is important. 147 is on the computer assistant dispatch. So this is not JL, this is a case- What about the fact that the caller misidentified where he was by quite a ways? He's scared, he's the victim of a crime. He misspelled his name, he wouldn't give a cell phone number. But over five pages of transcript, the call taker assesses his reliability and calls it out over the radio. And then I think the key to the case is the second call. A contemporaneous witness and victim telling the dispatcher that the officer's spotlighting him now, and it turns out to be true. I don't think we get that far, because this is not an anonymous JL case. What are the police to do if, Judge Bagby, you brought that up? Is the call taker supposed to run a criminal history on the victim of a crime? How long would that take? We don't know. Is that the kind of policy we want to have in this circuit? I think the officer did it by the numbers, and Judge Haggerty was correct in concluding there was reasonable suspicion. The second issue has to do with the prior conviction. He has a prior conviction for unlawful use of a weapon, where he fired a weapon within the city limits at the direction of a building. And the defendant says, well, that's not a crime of violence. And that affected his guideline range. We cited the Wiener case, which interpreted a similar statute from California, shooting at an inhabited premises, which is a victim. But this court said that there's a serious potential risk of physical injury under that California statute, regardless of whether it is inhabited. And that's the Oregon statute, regardless of whether it is inhabited. So clearly, if you fire a weapon within the city limits at the direction of a building, who could say that doesn't present a serious potential risk of physical injury? I don't understand how a argument can be made that that's not a crime of violence. There's no questions. Thank you. Thank you, counsel. Rebuttal. We'll give you one minute for rebuttal. Thank you, Your Honor. Your Honor, you asked the question, and Mr. Winehouse points out one word in this transcript, the word point. I would tell you, ER 4711 and 5, seven times the word show, three times the word guide. And the word point, although it's used here, does not say point of the gun. He guide a gun, and he point, he corrects, he show to use the show to. Throughout the rest of the transcript, only the words show. But counsel, this is also coming from somebody who's not a native English speaker. It's possible that the word show there is a stretch to find another word in English. I would say, Your Honor, that the record belies that. I think this whole conversation is conducted in English. There's conversation words used here that are far beyond the show for the word point. This gentleman was able to speak English throughout both these conversations with the officers. I think the record would indicate that he knows the language well. Mr. Winehouse makes the point that he continues to rely on the second phone call. I would ask the court to look at the record with respect to that. The record makes clear that if you look at the totality of the record, the excerpt at 12, 15, 41, 52, and 53. If you look at all that, what it shows is the officer testified. He comes up with his lights activated, gets out of the car, shines a light on the gentleman. The gentleman walks to his front porch, and that's when he gets the gun out. Counsel, what would the significance be of the defendant asking the victim where he was from? What would the significance of that be? Of the victim, the caller asking? The defendant asking the caller where the caller was from when he showed the gun to them. What would be the significance of that? He says, I would have no idea. I believe the gentleman did say that. He said something like, he just say where I'm from. He's trying to play that game. Isn't that a common prelude to a game challenge? Your Honor, I would say people ask people where they're from every day. And show them a gun at the same time? This record does not tell me, Your Honor, I would not want to infer what the significance of that would be. Counsel, if the officer believes, if the officer has word from a dispatcher, dispatcher says, look, this guy sounds like he's scared. I got a report, the guy's got a gun, and the officer finds him about to go into a motel room. He has no idea what's on the other side of the door. He has no idea what the guy's been up to. He can either stop him now or sort of give up on him, perhaps for the evening. He shines the light on him to see if the guy sort of matches the description. At this point, what he knows or what he thinks he knows is, he's shining a light on a guy who's just pulled a gun on somebody else. Now, at that point, is it unreasonable for the officer to ask him to spread his legs, to pull his own weapon as a defensive measure? All he knows at that point, Your Honor, and he has stopped him at that point. He has the overhead lines up, he's spotlighted, then he gets the gun out. This all occurs before the second call comes. That's why I'm asking you to look at those parts of the record. Makes it clear from the computer entry and what he said that he spotlighted the guy and he's got the gun out. The call hasn't been placed yet. But all he knows at that point is that this man, who somebody is trying to accuse of having a gun, and I see nothing that corroborates that accusation. Here's the person that I believe matches that description. That's all he knows about. I want to make sure I understand this, counsel. Does the second call come after the officer has stopped him? Yes. Then is the second call irrelevant? Yes, because the stop has already occurred. It doesn't enter into the calculus to determine whether or not there's a reasonable suspicion to stop this man. Because the call comes after the fact, and that's what it demonstrates. The officer says, I shined a light on him, and when we look, Your Honors, at this particular interaction, and it's in the ER at age 12. There's two numbers that are used here, 760 and 764. 760 means the officer is doing the stop. 764 is the backup. What we know from these sites that I've given you is that Officer Culp gets there two minutes before the other one. And when she says she's getting the call, the dispatcher says she's getting the call back. He says, I might have him, and he identifies the room. And what he's told us from his testimony is that he knows the room because that's when he's already spotlighted the man when he's walked to the room, and that's when he's got him at gunpoint. So he already has him at gunpoint and spotlighted before he gets the information that a second call's come in. And then you get 764, the backup comes saying, I'm just pulling into the lot. So he hasn't even arrived there. So what we know from it, we'll get the entire records that that call comes in after the stop has been conducted, so it's irrelevant. Thank you, counsel. The case just argued is submitted. The next case on calendar for argument is Hernandez-Hernandez v. Heal.
judges: Alarcon, Rawlinson, Bybee